## VERNAM v. PALMER et al.

*(Supreme Court, Special Term, New York County.   January 19, 1889.)*

1. INJUNCTION—TO RESTRAIN FUTURE ACTS.

   Where plaintiff brings an action to enjoin defendant from making certain uses of premises alleged to be unauthorized by the terms of a license under which defendant occupies them, and it appears that at the time of bringing the action defendant had not even threatened to make any use of the premises further than the license warranted, and that the particular acts charged in the complaint were expressly authorized, the complaint will be dismissed as premature.

2. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

   Where the damages caused by acts of trespass are trivial and susceptible of ascertainment, equity will not interfere.

Action by Charles E. Vernam against Charles P. Palmer and others, to enjoin alleged threatened acts of trespass.

*A. J. Dittenhoefer*, for plaintiff.   *Weekes & Forster*, (*George Bliss*, of counsel,) for defendants.

BARRETT, J.   The first question in this case is whether the plaintiff, assuming the facts to be as he avers, is entitled to an injunction.   I think he is.   It is true that equity will not interfere where there is an adequate remedy at law.   But here the remedy cannot be said to be adequate.   The trespasses complained of are continuous.   They seek permanently to disturb the plaintiff's enjoyment of the demised premises.   It is one of those cases, also, where, with regard to several at least of the claims, the damages are not readily susceptible of ascertainment.   In fact, it would be almost impossible to estimate them with anything like the precision required in a court of law.   The plaintiff is in the quiet and peaceable possession of the demised premises.   This charge is that the defendants, who are his landlords, have deliberately invaded such demised premises, and propose to take, occupy, and use a part of them permanently for their own purposes.   Such occupation and use cover many different parts of the demised premises, and involve various forms and methods of use.   There can be no doubt that this presents a proper case for equitable interference.   In a legal sense such injuries are irreparable.   The deprivation of the right of quiet and peaceable enjoyment cannot, under such circumstances, be adequately measured; and, such deprivation being continuous and permanent, the remedy by injunction should not be withheld.   A different rule will apply to some branches of the case.   Where, for instance, the defendants, under claim of license, have built a wall which has slightly encroached upon the area appurtenant to the demised premises, and the plaintiff has stood by and permitted such erection without complaint, equity will not by mandatory injunction require the defendants to take the wall down, but will leave the plaintiff to his remedy at law.   There is but little dispute between the parties as to what the defendants had done when this action was commenced.   Such acts certainly amounted to trespass, unless duly licensed.   A mere license, however, is revocable, unless it takes the form of an agreement founded upon consideration.   The defendants are bound to show such an agreement to justify their acts; and unless they have done so an injunction must run against them, except in some special instance, such as already pointed out, where it would be inequitable, or where the plaintiff, because of his own conduct, should be remitted to an action at law.   The case, then, is this:   The defendants, substantially conceding the commission of acts amounting, if not justified, to trespasses, set up three agreements, which they claim cover all that they have done or propose to do.   The first is the written agreement of May 19, 1888.   The second a parol agreement whereby the plaintiff, in consideration of $3,400 allowed to him upon his rent while the repairs to the hotel were being made, agreed to permit the defendants to use his kitchen and basement for certain purposes (involving inconvenience to him) during

the rebuilding of the theater. Third, that what has been called the "water-closet space" in the basement was ceded to the defendants in consideration of their putting in first-class closets in front, and a barber-shop. As to their second and third alleged agreements, I am with the plaintiff upon the facts. These agreements are not specifically set up in the answer; they rest entirely upon oral testimony, denied by plaintiff, and are unsupported by the surrounding circumstances. As to the second, Mr. Palmer's testimony is vague and inconclusive. At one time he says he made this allowance of $3,400 in consideration of certain alterations which the defendants were going to make in the kitchen, and the consequent inconvenience to which the plaintiff might be subjected. Again, he says that this allowance was made in connection with the written agreement of May 19, 1888, but on leaving the witness stand and conferring with his counsel he repeats his original statement. Apart from this, however, I think Mr. Palmer's letter (Exhibit 2) is conclusive. This letter was intended to be a written embodiment of the agreement with regard to this allowance of $3,400, and it is quite specific on that head; but it is silent as to any license, and leaves "the proposition as to alteration and loss of rooms," etc., to be "confirmed" in the future, namely, when "the theater matter is decided." Thus it appears that there was no existing basis for the license claimed, for, even if Mr. Palmer then knew (as he intimates) that the department would require a fire-proof structure, he could not well know quite what form it would take, nor what special inconveniences to the plaintiff had to be bargained for. The same views apply to the third alleged license. It is not specifically set up in the answer, and it is not evidenced by any writing. The testimony with regard to it is inconsistent with the subsequent offer, in substance, to pay for it. It is not reasonable to suppose that Mr. Palmer would have made a written offer of $25 per annum for the space if he believed that the plaintiff, in consideration of $4,600 of expenditure, had already ceded it.

The defendants' case, therefore, substantially rests upon the written agreement of May 19, 1888. It is proper to say, in this connection, that I have no doubt, upon the evidence, that at the time he signed this agreement the plaintiff had knowledge of the plans referred to in it. This is the result of a careful analysis of the testimony, and the surrounding circumstances strengthen this conclusion quite as much as they do the rejection of the second and third parol agreements already discussed. The true construction of this written agreement is not altogether clear. The fifth clause, which is the debatable one, commences by giving the defendants the right to take or use the Morton House, as may be required under the plans and specifications filed in the fire department. So far, there is no difficulty, and the license is general. But a specification follows of "the space so required to be taken," and this specification only covers the seventeen rooms over the old theater, four rooms on the first and second floors of the Morton House, adjoining the east wall of the theater, (required for stairways and exits,) and the old office of the hotel. In view of this specification, read in the light of what transpired contemporaneously, I see no way of construing the agreement so as to increase the number of rooms to be taken on the first and second floors from four to six. Both sides agree that a part of the consideration for this license, namely, reduction in the rent, had special reference to four rooms. If the defendants failed to secure thereby the space required by the plans that was their own affair. They cannot profit by their own negligence. The plans specified no rooms, but indicated space. The defendants calculated erroneously that four rooms would cover the required space, and accordingly bargained with reference to that calculation. It was not the intention of the parties to cover more than the four rooms, and although the plans are part of the agreement, the specific limitation governs. It governs because of the actual intention of the parties, as well as under the well-settled rule of construction. There the rule and the intent are in harmony. The defendants, therefore, were limited under this agreement, so far

as actual taking is concerned, to what is thus specified, and they cannot claim more, because of the generality of what precedes the specification.   In other words, they cannot take six rooms instead of four merely because they require six rooms to obtain the space indicated upon the plans.   As to the use, however, of what is not actually taken, I am with the defendants.   The intention of the parties was to embrace everything needful for the reconstruction of the theater under the plans.   That was the subject-matter.   The generality with which the fifth clause opens is in entire accord with the plaintiff's repeated and earnest proffers of the broadest possible license.   The theater was greatly to his advantage, and he was willing to make concessions and sacrifices to secure the renewal of its valuable patronage.   It is impossible to resist the conclusion that the evidence on this head greatly preponderates in the defendants' favor, both in the number of witnesses, the manner in which the ordeal of cross-examination was sustained, and the essential probabilities of the case. The agreement covered both taking and using.   No specification on the latter head is attempted, for the reason, doubtless, that the plaintiff was willing in his own interest (as already suggested) to subject the hotel to all the inconveniences contemplated in the execution of the plans.   An enumeration of these uses would have been quite a cumbersome and unnecessary bill of particulars, and it would have been almost impossible to specify in advance what might be needful in every contingency.   What was actually to be taken and permanently withdrawn from the plaintiff's enjoyment it was important to specify, and consequently it was specified.   What would cause but a temporary inconvenience, or even a permanent use which would deprive the plaintiff of no substantial enjoyment, it was unnecessary to detail, and consequently such detail was not attempted.   That was left to the general license with which the fifth clause sets out.   Every use, then, fairly contemplated in the execution of the plans, was covered by the agreement and by the full and adequate consideration therein expressed.   It is unreasonable to suppose that the defendants agreed to allow the plaintiff $4,500 per annum for rights which, unless supplemented by other privileges, would become either nugatory or of greatly impaired value.   It is quite clear to my mind that this agreement con templated finality in the negotiations—for giving and taking—as between th parties, and that the arrangement was to furnish the defendants (for a good consideration) with the means of practically and fully executing the plans for the construction of their theater.   In arranging and fixing the consideration the parties doubtless considered the specific rooms which were to be permanently taken.   But the general use thereafter of what the plans demanded was included in both consideration and bargain.   Any other construction would treat the entire first paragraph of the fifth clause as an idle superfluity.   Strike it entirely out and you have precisely what the draughtsman and the parties intended, according to the plaintiff's construction.   This, in my judgment, will not answer.   The paragraph had its meaning.   It is distinct and full in its generality.   This generality was contemplated.   Everything points in that direction, and the subsequent limitation was simply to define the precise number of rooms of which the plaintiff was to be wholly and permanently deprived, either for renting purposes or otherwise, in the r nning of the hotel.   This conclusion is not affected by the course which Mr. Palmer subsequently adopted.   It was perfectly natural, in view of the phraseology of the fifth clause, that he should have sought a memorandum or some more specific statement as to the required rooms, and that, to avoid ambiguity, he should have been willing, before signing important building contracts, to pay additional sums to secure certainty.   The doubt which pervaded his mind on this head may well have run through all the other uses.   What admits of fair argument in the case at bar, and calls for judicial construction, cannot be said to be so clear that a layman had no right to doubt.   And he may also, without undue skepticism, have become a little uncertain as to the plaintiff's in-

tentions and good faith, for it was about this time that the plaintiff intimated a desire for a renewal of his lease without security. I cannot but think that the refusal to accede to this request had much to do with his subsequent change of attitude, if, indeed, it be not the key-note of the entire litigation. At all events there is not enough in these letters, taken in connection with the circumstances under which they were written, to warrant the court in treating them as Mr. Palmer's deliberate construction of the agreement or understanding of his strict rights thereunder. They rather indicate doubt as to the effect of the draughtsman's phraseology,—that is, whether such phraseology was sufficiently clear to carry out the real understanding of the parties,—and a determination to run no risks and to assume no responsibilities until the rights generalized in the agreement had been particularized in black and white, or, as he puts it in one of these letters, "signed, sealed, and understood,"—that is, understood without possible question. For that, in view of the large contracts which he was about to enter into, he was willing to pay something beyond what had already been provided for. It follows that all the acts complained of were within the license, except as to the two rooms, the areaway, and the water-closet space.

Of course the authorized uses must be reasonably executed. For example, the fire-proof ceiling in the kitchen must be preceded, as suggested on the trial, by a temporary dust-proof structure sufficient to reduce the plaintiff's inconvenience to a minimum. The stairway for exit from the gallery must be executed, as suggested by Mr. Eidlitz, so as to make no substantial change in the use of room 70 nor in the access thereto. And so as to the piers, columns, and girders complained of. They must be so placed as not to interfere with the substantial use and enjoyment of the premises, or proper access thereto. Of course the space below, necessary for the placing of a pier, column, or girder, is technically a taking of the precise spot upon which such pier or column rests. But that involves no substantial diminution of the plaintiff's use and enjoyment of the localities where such necessities arise. It is really a use. And it was such a use as this, quite as much as the mere temporary occupation of the premises by workmen, which was contemplated by the agreement under consideration. The same observations apply to the change in the chimneys, and to various other small matters, but not seriously prejudicial to the plaintiff. Indeed, several of these complaints are with regard to improvements which, at the cost of temporary inconvenience, will unquestionably be a benefit not only to the defendants' reversion, but to the plaintiff's present use. As to the area and water-closet space, the case does not, in my judgment, warrant an injunction, which, in view of actual occurrences, must necessarily be mandatory,—that is, requiring the taking down and removal of walls. The damages in these two specific instances are susceptible of ascertainment. As to the water-closet space the facts and charges are not specifically set forth in the complaint; but, even if they were, as laid before us on this trial, the damages must necessarily be trifling. And further, the facts as to this space, and the erection thereon, are too doubtful, and the consequences of the defendants' acts too trivial, to justify the interference of the court as a court of equity. As to the area, I entirely agree with the plaintiff that it is a part of the demised premises, or appurtenant thereto. But I am satisfied that the plaintiff knew of the encroachment now complained of when he signed the license with regard to the construction of the wall. Mr. Foster testifies that he informed him of the encroachment, and I am unable to find any denial of this on the plaintiff's part. It is true that he denies having seen the tracing on which it is claimed that the encroachment was outlined. He also denies that the tracing was fastened to the license when he signed it. But Mr. Foster's testimony goes beyond this, and refers to distinct information with regard to the encroachment apart from the tracing, and this is what I do not find any denial of. But I am also inclined to credit Mr. Foster as to

the tracing. However this question of fact may be viewed, it is conceded that the wall has been practically completed; and it would be grossly inequitable, in view of the plaintiff's silence and of all the circumstances, to require it to be now taken down. The loss, if any, caused by the erection of the wall upon a small part of this area was readily ascertainable, and adequate redress could have been had in a court of law. Upon the whole, there is no ground for an injunction, nor was there any such ground when the action was commenced. While the question with regard to the two extra rooms on the first and second floors has been considered, it was not imminent when the plaintiff procured the temporary injunction. No charge on that head was made in the complaint, not even of a threat to take the rooms. The injunction was procured solely upon the acts of the defendants and their employés in the lower part of the house. Those acts, as we have seen, were within the license embodied in the agreement of March 19, 1888. The plaintiff, therefore, upon the actual averments of the complaint, came into the court as a court of equity, without just cause existing in fact at the time of the commencement of the action. In all other respects the action was premature. The plaintiff should have submitted to the uses contracted for, and awaited any excess on the defendants' part before proceeding. It would have been time enough when the defendants threatened or were about to take the two rooms in question, or when they threatened or were about to go otherwise outside the license, for the plaintiff to take preventive measures to keep them within the bounds of the agreement. Not having done this, but having proceeded prematurely upon acts which, so far as done, were authorized, he must fail. The complaint should therefore be dismissed, with costs.